UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

HARVEY B. SHAPIRO,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No. 2:13-cv-01688-APG-PAL

**REPORT OF FINDINGS AND RECOMMENDATION**

(Mtn to Reverse – Dkt. #25)
(Cross Mtn SJ – Dkt. #28)

This case involves judicial review of administrative action by the Commissioner of Social Security denying Plaintiff Harvey B. Shapiro's claim for disability benefits under Title II of the Social Security Act (the "Act").

## BACKGROUND

On July 3, 2010, Shapiro filed an application for disability insurance benefits, alleging he became disabled on June 30, 2010. AR[1] 144-51.  The Social Security Administration ("SSA") denied Shapiro's application initially and on reconsideration. AR 98-101, 103-05.  Shapiro was present with counsel and testified at a hearing before administrative law judge ("ALJ") Barry Jenkins on December 19, 2011, in Las Vegas, Nevada. AR 45-86.  In a decision dated January 23, 2012, the ALJ found Shapiro was not disabled. AR 10-32.  Shapiro requested review of the ALJ's decision by the Appeals Council, and the ALJ's decision became the Commissioner's final decision when the Appeals Council denied review on July 26, 2013. AR 1-6.

On October 25, 2013, Shapiro filed an Amended Application to Proceed in Forma Pauperis (Dkt. #3) and submitted a Complaint (Dkt. #5) in federal court, seeking judicial review

---

[1]  AR refers to the Administrative Record, which was delivered to the undersigned upon the Commissioner's filing of her Answer (Dkt. #13) on January 31, 2014.

1

1   of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her

2   Answer (Dkt. #13) on January 31, 2014.  Shapiro filed a Motion for Remand (Dkt. #25), and the

3   Commissioner filed a Response and Cross-Motion for Summary Judgment (Dkt. #28).  The court

4   has considered the Motion, and the Response and Cross-Motion.

5   **DISCUSSION**

6   **I.    Judicial Review of Disability Determination.**

7       District courts review administrative decisions in social security benefits cases under 42

8   U.S.C. § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  After the

9   Commissioner of Social Security has held a hearing and rendered a final decision, a disability

10  claimant may seek review of the Commissioner's decision by filing a civil lawsuit in federal

11  district court in the judicial district where the disability claimant lives.  *See* 42 U.S.C. §

12  405(g).The district court may enter, "upon the pleadings and transcripts of the record, a judgment

13  affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or

14  without remanding the cause for a rehearing."  The Ninth Circuit reviews a decision of a district

15  court affirming, modifying, or reversing a decision of the Commissioner de novo.  *See Batson v.*

16  *Commissioner*, 359 F.3d, 1190, 1193 (9th Cir. 2003).

17      The Commissioner's findings of fact are conclusive if supported by substantial evidence.

18  42 U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the

19  Commissioner's findings may be set aside if they are based on legal error or not supported by

20  substantial evidence.  *See Stout v. Comm'r, Soc. Sec. Admin.,*454 F.3d 1050, 1052 (9th Cir.

21  2006); *see also Thomas v. Barnhart,* 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit

22  defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is

23  such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

24  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart,* 427 F.3d

25  1211, 1214 n. 1 (9th Cir. 2005).  In determining whether the Commissioner's findings are

26  supported by substantial evidence, the court "must review the administrative record as a whole,

27  weighing both the evidence that supports and the evidence that detracts from the Commissioner's

28

conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

Under the substantial evidence test, the Commissioner's findings must be upheld if supported by inferences reasonably drawn from the record. *See Batson*, 359 F.3d at 1193. When the evidence will support more than one rational interpretation, the court must defer to the Commissioner's interpretation. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Consequently, the issue before the court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent on the ALJ to make specific findings so that the court does not speculate about the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. Cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are insufficient. *See Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Id.*

## II.     Disability Evaluation Process

The claimant has the initial burden of proving disability. *See Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996). He or she must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must provide "specific medical evidence" to support his or her claim of disability. If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *See Batson*, 157 F.3d at 721.

/ / /

3

The ALJ follows a five-step sequential evaluation process in determining whether an individual is disabled.  *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  If at any step the ALJ makes a finding of disability or non-disability, no further evaluation is required.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).  The first step requires the ALJ to determine whether the individual is currently engaging in substantial gainful activity ("SGA").  *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b).  If the individual is currently engaging in SGA, then a finding of not disabled is made.  If the individual is not engaging in SGA, then the analysis proceeds to the second step.

The second step addresses whether the individual has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work.  *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[2]  If the individual does not have a severe medically-determinable impairment or combination of impairments, then a finding of not disabled is made.  If the individual has a severe medically-determinable impairment or combination of impairments, then the analysis proceeds to the third step.

Step three requires the ALJ to determine whether the individual's impairments or combination of impairments meet or medically equal the criteria of impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826.  If the individual's impairment or combination of

---

[2]SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray*, 554 F. 3d at 1223 (finding ALJ erred in disregarding SSR 85-41).

1    impairments meet or equal the criteria of a listing and meet the duration requirement (20 C.F.R.

2    §§ 404.1509 and 416.909), then a finding of disabled is made.  *See* 20 C.F.R. §§ 404.1520(h) and

3    416.920(h).  If the individual's impairment or combination of impairments does not meet or

4    equal the criteria of a listing or meet the duration requirement, then the analysis proceeds to the

5    next step.

6           Before considering step four of the sequential evaluation process, the ALJ must first

7    determine the individual's residual functional capacity ("RFC").  *See* 20 C.F.R. §§ 404.1520(e)

8    and 416.920(e).  RFC is a function-by-function assessment of the individual's ability to do

9    physical and mental work-related activities on a sustained basis despite limitations from

10   impairments.  *See* SSR 96-8p.  In making this finding, the ALJ must consider all the relevant

11   evidence such as symptoms and the extent to which they can be reasonably be accepted as

12   consistent with the objective medical evidence and other evidence.  *See* 20 C.F.R. §§ 404.1529

13   and 416.929; SSRs 96-4p and 96-7p.  To the extent that statements about the intensity,

14   persistence, or functionally limiting effects of pain or other symptoms are not substantiated by

15   objective medical evidence, the ALJ must make a finding on the credibility of the individual's

16   statements based on a consideration of the entire case record.  The ALJ must also consider

17   opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and

18   SSRs 96-2p, 96-5p, and 06-3p.

19          The fourth step requires the ALJ to determine whether the individual has the RFC to

20   perform his past relevant work ("PRW").  *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f).  PRW

21   means work performed either as the individual actually performed it or as it is generally

22   performed in the national economy within the last fifteen years or fifteen years prior to the date

23   that disability must be established.  In addition, the work must have lasted long enough for the

24   individual to learn the job and to perform it as SGA.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565,

25   419.960(b), and 416.965.  If the individual has the RFC to perform his past work, then a finding

26   of not disabled is made.  If the individual is unable to perform any PRW or does not have any

27   PRW, then the analysis proceeds to the fifth and final step.

28

Step five requires the ALJ to determine whether the individual is able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g) and 416.920(g).  If he or she can do other work, then a finding of not disabled is made.  Although the individual generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the individual can do.  *Yuckert*, 482 U.S. at 141-42.

### III.    Factual Background.

#### A.    Testimony at Administrative Hearing.

Shapiro appeared with counsel and testified at a hearing December 19, 2011, before ALJ Barry H. Jenkins.  He testified that he suffered from agoraphobia for the previous five years and had struggled with anxiety and depression for over twenty-five years.  AR 50.  Plaintiff lived alone, was divorced, and had graduated high school.  AR 51.  Previously, Shapiro was self-employed, and he worked as a musician playing the pedal steel guitar.  AR 52.  He did not know why he stopped doing that work because he was "perhaps the best in town on this instrument" and there were available opportunities to play.  *Id.*  Shapiro told the ALJ that starting in 2007, he started having anxiety attacks.  AR 53.  Shapiro testified that when he was asked to perform, his anxiety increased, and he would cancel his appearance; eventually, his boss stopped calling him to perform.  AR 55.  Shapiro had not played his instrument at home in two or three months because he had "stopped doing anything [he] used to do for pleasure."  AR 63.

Plaintiff testified that when he was younger, he frequently used marijuana, but he no longer used it because it exacerbated his anxiety.  AR 56.  Plaintiff had also used cocaine before but not in twenty-eight years.  *Id.*  Plaintiff's weight of 113 pounds (at 5'9" tall) prevented him from using stimulants, including coffee.  AR 56, 59.  Shapiro admitted to using LDS, cocaine, and other drugs in the 1960s and 1970s, but he never used methamphetamine.  AR 59-61.

Shapiro told the ALJ his medications made him jittery, anxious, and anorexic.  AR 56*.* He testified that he had tried "so many meds," and at the time of the administrative hearing, he was taking Celexa and Xanax.  *Id.*  Plaintiff reported the Celexa made him shaky and jittery,

caused insomnia, and made his anorexia worse.  AR 57.  He testified that at night, he only slept about four hours at a time, and he often awoke in a panic attack.  *Id.*  He took Xanax and went back to sleep.  *Id.*  During the day, Plaintiff worried about one thing or another.  *Id.*  He told the ALJ he could not work because of his social anxiety, agoraphobia, and the fact that he did not fit in anywhere.  AR 57-58.  Shapiro testified that he left his home about four to six times per month to attend therapy.  AR 66.  He also collected his mail once per week, and when his refrigerator was empty for a couple of days, he would force himself to go to the grocery store.  *Id.*

Shapiro smoked about fifteen cigarettes per day, although he had COPD, and became easily winded when walking..  AR 62.  He estimated he could lift fifty pounds one time, but he could not do any sustained lifting because of his left shoulder pain.  AR 63.  Plaintiff testified that he did not consider his left shoulder pain to be disabling.  AR 63.

Shapiro told the ALJ that on a good day, he had one panic attack per day.  On a bad day, he had them every few hours, despite taking his medication.  AR 66.  During a panic attack, Plaintiff felt like he wanted to die, had shortness of breath, and his hands went numb.  *Id.*  Shapiro testified that he considered suicide on an almost-daily basis, but that ethically, he could not do it because of his son.  AR 67.  He testified that in general, his outlook on life was "whatever I care about . . . whatever seems important, and I say I'll do, when the time comes, I often won't."  AR 69.

Jack Dymond, a vocational expert ("VE"), asked Shapiro about his past work as a "market research analyst," and Shapiro explained he had occasionally worked remotely for a friend since 1996.  AR 71.  His friend's company specialized in "beverage studies," and Shapiro had a "glorified data entry job," where he created workbooks and categorized the data his friend sent him.  AR 71-72.  Plaintiff testified his friend let him spend a week on an assignment that should require about four total hours of work to complete.  AR 71.

The VE testified that Shapiro's PRW in this position would be a data entry clerk, semi-skilled, sedentary, SVP 4, and Shapiro's PRW as a musician was light SVP 8, but as Shapiro actually performed it, medium, because he lifted equipment, including his guitar and an amplifier.  AR 75.  Shapiro testified his steel guitar weighs about seven or eight pounds, and its

case and amplifier are sixty to seventy pounds.  *Id.*  The VE testified that a person of Shapiro's age, education, and experience who could work at a medium exertional level with frequent postural manipulations, avoiding ladders, ropes, or scaffolds, could not physically perform Shapiro's PRW.  AR 79.  If the person were limited to only occasional interaction with co-workers and the public, the VE testified that person could not do Shapiro's PRW as a musician, but he could do the data clerk entry position.  AR 81-82.

However, the person could perform other medium, unskilled work, including as a change person (6,500 jobs in Nevada and 27,000 nationally), golf range attendant (37,000 jobs in Nevada and 228,000 nationally), or a porter (2,000 in Nevada and 30,000 nationally).  AR 79-80. If the person were also limited in interacting with coworkers and the general public, that person could not do the change person job but could still work as a golf range attendant and a porter. AR 80-81.

Further, with the added limitation on contact with coworkers and the public, the VE testified the hypothetical person could do the following jobs at the light exertional level: cleaner/polisher (1,400 jobs in Nevada, 480,000 nationally), assembly press operator (1,280 in Nevada, 300,000 nationally), or laundry sorter (1,900 in Nevada, 490,000 nationally).  AR 81.

The VE testified that a person who had to miss one day of work per week in a five-day per week schedule could not maintain fulltime gainful employment, and would not be competitive in the national economy.  AR 82.  The VE testified that depending on the person's job, a person could be unproductive for ten minutes of every hour, in addition to regular breaks, and still be employable in the national economy.  *Id.*  If, however, the person required supervisory redirection every hour or hour and a half, they would not employable in the national economy.  *Id.*

**B.    Shapiro's Medical Records.**

The court's Scheduling Order (Dkt. #15), required the parties to either stipulate that the ALJ fully and fairly summarized the medical evidence or provide a summary of the medical evidence themselves.   The Commissioner complied, representing the ALJ fully and fairly

1  summarized the medical evidence in the record. Plaintiff did not comply and instead
2  summarized only the ALJ's decision.

3  **III.    The ALJ's Decision.**

4          The ALJ found Shapiro met the insured status requirements of the SSA through
5  December 31, 2014. At step one, the ALJ found Shapiro had not engaged in SGA since the June
6  30, 2010, the alleged onset of disability date. At step two, the ALJ found Shapiro had the
7  following severe impairments: chronic obstructive pulmonary disorder ("COPD"),[3] anxiety-
8  related disorders, and affective mood disorders. The ALJ also found the record contained
9  objective evidence that Shapiro had been evaluated and treated for disorders of the left
10  shoulder's rotator cuff and substance abuse, in remission, but the ALJ found these conditions
11  were managed medically, and could be controlled by adherence to recommended medical
12  management and medication compliance. The ALJ, therefore, found these conditions were non-
13  severe.

14          In determining Shapiro's RFC, the ALJ considered the functional limitations from all of
15  Plaintiff's medically-determinable impairments, severe and non-severe. The ALJ found
16  Shapiro's alleged anorexia was not a medically-determinable impairment because there was a
17  lack of objective evidence in the record to support it. The ALJ acknowledged the record
18  contained "mention of anorexia, there was no clear evidence to establish it, and the claimant
19  indicated he had [not] weighed himself for five years." AR 31.

20          At step three, the ALJ found Shapiro did not have an impairment or combination of
21  impairments that met or medically-equaled the severity of one of the listed impairments in 20
22  C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings 12.04, 12.06, and/or 12.09. The
23  ALJ considered the Paragraph B criteria, finding Shapiro's mental impairments caused no
24  restriction of activities of daily living; moderate difficulties maintaining social functioning, no
25  difficulties in maintaining concentration, persistence, or pace; and no episodes of
26  decompensation of extended duration.

27  ---
[3] COPD is a progressive disease that makes it hard to breathe and can cause symptoms of, inter
28  alia, coughing, mucus, wheezing, shortness of breath, and chest tightness. *See* "What is COPD?"
*available at* www.nhlbi.nih.gov/health/health-topics/topics/copd (last visited Feb. 12, 2015).

The ALJ also considered the Paragraph C criteria for Listings 12.04 and 12.06 and found the evidence failed to establish the presence of the C criteria for either Listing.  In addition, the ALJ found Shapiro's mental impairments did not meet or medically-equal the criteria of Listing 12.09, and none of the physical or mental disorders referred to by Listing 12.09 were satisfied in this case.

The ALJ found Shapiro had the RFC to perform medium work, including frequent postural activities, except no climbing ladders, ropes, or scaffolds, and only occasional interaction with the public and coworkers.  In making this finding, the ALJ found Plaintiff's subjective complaints were not fully credible.  Specifically, the ALJ observed that in Plaintiff's June 29, 2010, and August 2, 2010, Adult Function Reports, Plaintiff acknowledged he took care of a fish and a cat, had no physical problems with personal care, prepared simple meals, and did several loads of laundry and dishes each week.  He admitted he could go out alone, and he watched television, surfed the internet, and occasionally spoke with others on the phone.  Plaintiff also admitted he finished what he started when he started something, could pay attention if the subject was of interest, could follow instructions accurately, and got along with authority figures.  The ALJ found that despite Plaintiff's alleged impairments, Shapiro engaged in "a somewhat normal level" of daily activities and social interactions, some of which were the same as those necessary to obtain and maintain employment.  The ALJ found Shapiro's ability to participate in those activities undermined the credibility of his allegations of disabling functional limitations.

The ALJ found that in August 2010 and September 2011, Plaintiff was treated with conservative routine prescription medication.  Additionally, Plaintiff declined to have recommended lab work done due to a lack of funds.  The ALJ specifically found there was "no evidence [Shapiro] sought low cost or no cost medical care as necessary."  AR 34.   He found Shapiro's failure to seek "consistent medical treatment as prescribed" demonstrated "a possible unwillingness to do what is necessary to improve [Shapiro's] condition."  *Id.*

Additionally, the ALJ observed that Shapiro's progress notes from the Jewish Family Service Agency ("JFSA") described Shapiro as "having good motivation, focusing on relevant

topics, identifying/expressing feelings, active and verbal, seeing different perspectives, and using sessions constructively." *Id*. Plaintiff saw his psychologist, Dr. Havi Mandell, Ph.D., LCSW, and others at JFSA between August 2007 and July 2010. The ALJ also noted that Shapiro discontinued counseling service at a time that coincided with his alleged onset date. *Id.* The ALJ found that Plaintiff also received psychotherapy between December 2010 and November 2011, but a progress note from November 2011 indicated Plaintiff could not continue regular counseling despite his therapist's recommendation. The therapist referred Shapiro to family agencies and provided his phone number to Shapiro. The ALJ found Shapiro's "inability to continue regular counseling demonstrates a possible unwillingness to do what is necessary to improve his condition. It may also be an indication that [Shapiro's] symptoms were not a severe as he purported." *Id.* Although not his primary basis for the decision in this case, Shapiro's "failure to follow prescribed treatment without a good reason is a basis for finding [Shapiro] is not disabled." AR 34-35.

The ALJ considered and gave little weight to the mental RFC questionnaire completed by Eugene R. Jenuan, M.D., on November 14, 2011, who opined Plaintiff suffered from anxiety, sadness, and an inability to focus or concentrate. The ALJ found Dr. Jenuan prescribed Plaintiff routine conservative prescription medication, including Celexa and Xanax, but Plaintiff could not afford them. Dr. Jenuan opined that Shapiro's mental abilities and aptitudes to do unskilled work ranged between unable to meet competitive standards and no useful ability to function and that Shapiro would miss more than four days of work per month due to his disability.

The ALJ also considered and gave little weight to the mental RFC questionnaire completed by Dr. Mandell on November 15, 2011, who opined Plaintiff experienced anxiety, depression, and an impaired ability to focus or leave his home. Dr. Mandell opined Plaintiff's mental abilities and aptitudes needed to do unskilled work ranged between unlimited or very good and no useful ability to function and that Shapiro would miss more than four days of work per month due to his impairments.

The ALJ found that the findings of Drs. Jenuan and Mandell were not consistent with the overall record that showed Shapiro's treatment was limited to routine conservative prescription

medication.  In addition, Plaintiff did not comply with his treatment, he admitted continuing to smoke despite having COPD, and he denied any suicidal or homicidal ideation.  The ALJ found Plaintiff's Global Assessment of Functioning ("GAF") scores were of limited evidentiary value because GAF scores are, as a general matter, subjectively assessed and reveal only snapshots of impaired and improved behavior.  The ALJ gave more weight to the "objective details and chronology" of the record, which the ALJ found more accurately described Shapiro's impairments and limitations.

The ALJ gave great weight to the opinion of David Mumford, M.D., an internal medicine consultant, who examined Shapiro on September 20, 2010, and diagnosed Shapiro as a heavy cigarette smoker for many years with COPD, emphysema, and chronic rotator cuff tendinopathy. Dr. Mumford opined Shapiro could perform a range of medium work with frequent postural activities, except no climbing ladders or scaffolds.  The ALJ found Dr. Mumford's assessment was consistent with his own benign clinical findings during his examination of Shapiro.  The ALJ, therefore, made a similar RFC finding based upon the objective medical evidence.

**IV.    The Parties' Positions.**

    **A.    Shapiro's Motion to Remand.**

Shapiro argues the ALJ impermissibly rejected Dr. Mandell's opinion as inconsistent with the overall record, which the ALJ found established: (a) Plaintiff's treatment was limited to routine conservative prescription medication and treatment; (b) Plaintiff was non-compliant with treatment; (c) he continued to smoke; and (d) he denied suicidal or homicidal ideation.  First, Plaintiff asserts that Dr. Mandell was Plaintiff's treating physician during the relevant period and saw Shapiro weekly for several years of psychotherapy before Plaintiff could no longer afford the appointments.  Dr. Mandell's treating physician opinion is entitled to greater weight, and the ALJ failed to provide specific and legitimate reasons to reject it for several reasons.

First, Plaintiff's treatment was not limited as the ALJ found because Shapiro tried multiple treatment modalities, including psychotherapy, medication, and behavioral therapy, all without success.  Second, Plaintiff asserts the record establishes that he was compliant with his treatment.  Dr. Mandell never checked the non-compliance box on any of Plaintiff's progress

1    notes, and generally the notes reflect Plaintiff was moderately and minimally compliant.

2    Additionally, Plaintiff argues that other courts have held that a claimant's noncompliance with

3    mental health treatment may be a symptom of the person's impairment, rather than evidence of a

4    claimant's lack of credibility.

5         Third, Plaintiff contends that the ALJ improperly considered Plaintiff's continued

6    smoking to reject Dr. Mandell's opinion.  Plaintiff argues that Dr. Mandell treated Plaintiff's

7    mental, not physical, impairments, and the opinions of Dr. Mandell "have no bearing on whether

8    [Plaintiff] continued to smoke."  Motion at 8:17-18.  Fourth, Plaintiff asserts the record shows

9    Plaintiff did have suicidal thoughts or intent, contrary to the ALJ's final reason for rejecting Dr.

10   Mandell's opinion.  Additionally, Plaintiff argues Mandell's opinions are substantiated by his

11   treatment notes.  Finally, because the ALJ also rejected the opinions of Dr. Jenuan, there was no

12   medical evidence on which the ALJ could base an RFC finding.  Plaintiff asserts Dr. Mandell's

13   opinion should be credited as true, and the court should reverse for payment of benefits.

14        Shapiro also argues the ALJ failed to give clear and convincing reasons for rejecting his

15   testimony.  Shapiro acknowledges that he has the burden of establishing a condition that would

16   cause pain and dysfunction, but once he has met his burden, the burden shifts to the

17   Commissioner to articulate specific and legitimate reasons for rejecting pain and limitation

18   testimony.  To reject a claimant's testimony, the ALJ must rest his opinions on discrepancies

19   between activities and assertions of pain.  The ALJ did not explain how Plaintiff's activities of

20   daily living would translate to work activities, and cases have recognized that many home

21   activities are not transferrable to a more grueling workplace environment.

22        **B.**     **The Commissioner's Motion to Affirm and Opposition to Motion to Remand.**

23        The Commissioner asserts that the ALJ gave good reasons, supported by substantial

24   evidence, for his decision to assign little weight to Dr. Mandell's opinions, as required by 20

25   C.F.R. § 404.1527(d)(2).   The ALJ reasoned Dr. Mandell's opinion deserved little weight

26   because it was inconsistent with evidence of less extreme limitations in the record.  The medical

27   evidence supports the ALJ's findings that Plaintiff received routine, conservative care and denied

28   suicidal or homicidal ideation, all of which supports the ALJ's assessment of Plaintiff's RFC.

1    Specifically, the Commissioner argues the record establishes Plaintiff received regular

2    therapy sessions and a prescription of Xanax for anxiety-related symptoms.  AR 405.  There is

3    no record of any hospitalization for Plaintiff's mental health impairments.  Although the record

4    does show periods of increased anxiety and depression, much of the record evidence, including

5    some of Dr. Mandell's own notes, are inconsistent with Dr. Mandell's finding of complete

6    disability.  On the whole, Dr. Mandell's treatment notes reflect that Plaintiff was focused during

7    his therapy sessions on relevant issues, could identify and express his feelings, and could see

8    different perspectives.  Plaintiff had good to excellent motivation and never had homicidal

9    ideation.  The Commissioner concedes that although some of Dr. Mandell's notes indicate

10   Plaintiff had thoughts of dying or suicidal thoughts, the records indicate Plaintiff did not intend

11   to act on those thoughts.  Additionally, Plaintiff admitted he could pay attention for long periods

12   if he found a task interesting and that he could accurately follow written instructions, both of

13   which are inconsistent with Dr. Mandell's opinion that Plaintiff would have trouble maintaining

14   attention and pace in a work setting.

15       The Commissioner asserts that the ALJ based his mental RFC findings on medical

16   opinion evidence.  The ALJ specifically considered the opinions of Dr. Steven Goldstein, Ed.D.

17   and state agency psychologist Pastora Roldan, Ph.D., and gave them little weight, because they

18   did not sufficiently address all of Plaintiff's functional limitations.  Additionally, the ALJ

19   accepted Dr. Goldstein's opinion that Plaintiff could complete simple and complex tasks on a

20   sustained basis, which is inconsistent with Dr. Mandell's opinion and provides additional support

21   for the ALJ to have rejected Dr. Mandell's opinion.

22       The Commissioner also argues the ALJ appropriately assessed Plaintiff's credibility.  The

23   ALJ properly reasoned that: (1) Plaintiff's daily activities were inconsistent with the finding of

24   complete disability; and (2) Shapiro did not always comply with treatment recommendations.

25   Although Shapiro claimed agoraphobia and severe anxiety, he also testified he could go out

26   alone, shop, pay attention for long periods of time to tasks he found interesting, follow written

27   instructions accurately, and get along well with authority figures.  The key question in this case

28

1   is not whether Shapiro's activities indicate some limitations.  Rather, "the key question is

2   whether such evidence is inconsistent with the claimed extent of disability."

3          The record in this case is replete with references that Plaintiff did not comply or only

4   minimally complied with treatment recommendations.  Shapiro discontinued counseling in July

5   2010, close in time to his alleged date of disability onset.  Shapiro resumed counseling between

6   December 2010, and November 2011, but again ceased treatment against his provider's

7   recommendation.  The ALJ properly found that Shapiro did not have a good reason for

8   discontinuing counseling in November 2011, because his psychologist recommended that he

9   continue care through family service agencies and provided him a telephone number for

10  counseling, but there is no evidence Shapiro followed these recommendations.  This indicates a

11  possible unwillingness to do what is necessary to improve his condition, and may also indicate

12  his symptoms were not as severe as reported.  All of these are specific reasons supported in the

13  Administrative Record for discounting Shapiro's credibility.

14  **V.      Applicable Law & Analysis.**

15          **A.      The ALJ's Rejection of Treating Physician Opinions.**

16          The implementing regulations for Title II of the Social Security Act distinguish among

17  the opinions of three types of physicians: first, treating physicians; second, examining physicians

18  (i.e., physicians who examine but do not treat a claimant); and third, non-examining or reviewing

19  physicians (*i.e.,* physicians who neither examine nor treat the claimant, but review the claimant's

20  file).  *See Lester v. Chater,* 81 F.3d, 821, 830 (9th Circuit 1995); 20 C.F.R. § 404.1527(d).

21  Generally, a treating physician's opinion is entitled to more weight than an examining

22  physician's, and an examining physician's opinion is entitled to more weight than a reviewing

23  physician's.  *See Ghanim v. Colvin,* 763 F.3d 1154, 1160 (9th Cir. 2014) (citing *Holohan v.*

24  *Massanari,* 246 F.3d 1195, 1202 (9th Cir.2001)); *see also Lester,* 81 F.3d at 830; 20 C.F.R.

25  § 404.1527(d).  A treating physician's opinion is entitled to "controlling weight" if it is well-

26  supported by medically acceptable clinical and laboratory diagnostic techniques and "not

27  inconsistent" with substantial evidence in the record.  *See Orn v. Astrue,* 495 F.3d 625, 631 (9th

28

1   Cir.2007); 20 C.F.R. § 404.1527.  Where a treating physician's opinion is not given controlling

2   weight, it is not rejected and may still be entitled to deference.  *Orn,* 495 F.3d at 631–632.

3          In determining how much weight to afford a treating physician's opinion that is not

4   controlling, an ALJ must consider the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6).  *See*

5   *Ghanim,* 763 F.3d at 1160 (citing *Orn,* 495 F.3d at 631 and 20 C.F.R. § 404.1527(c)(2)); SSR

6   No. 96–2p at 1 ("A finding that a treating source's medical opinion is not entitled to controlling

7   weight does not mean that the opinion is rejected").  These factors include the length of the

8   treating relationship, the frequency of examination by the treating physician, the nature and

9   extent of the relationship between the claimant and the treating physician, whether the

10  physician's opinion is supported with medical evidence, and the consistency of the physician's

11  opinion with the record as a whole. *Id.* (citing 20 C.F.R. § 404.1527(c)(2)-(6)). "In many cases, a

12  treating source's medical opinion will be entitled to the greatest weight and should be adopted,

13  even if it does not meet the test for controlling weight."  *Id.* (citing *Orn,* 495 F.3d at 631); SSR

14  No. 96-2p at 4.

15         Here, the ALJ considered, but gave little weight to the opinions of both Dr. Jenuan,

16  Plaintiff's treating psychiatrist, and Dr. Mandell, Plaintiff's treating psychologist.  A licensed or

17  certified psychologist is an acceptable medical source who can provide evidence to establish

18  impairment.   20 C.F.R.  § 404.1513(2).   The Ninth Circuit regards a psychologist as the

19  equivalent as a treating physician and has held that the ALJ cannot disregard a psychologist's

20  opinion unless he sets forth specific legitimate reasons for doing so that are based on substantial

21  evidence in the record.  *Jamerson v. Chater*, 112 F.3d 1064, 1066-67 (9th Cir. 1997) (quoting

22  *McAllister v. Sullivan*, 888 F.2d 599 (9th Cir. 1989).

23         The ALJ's opinion in this case did not acknowledge that Dr. Jenuan and Dr. Mandell

24  were treating physicians.  The ALJ's decision did not consider the factors set out in 20 C.F.R. §

25  404.1527(c) determining how much weight to afford Shapiro's treating physician medical

26  opinions.  The Administrative Record reflects progress notes showing Plaintiff treated with Dr.

27  Mandell from at least November 27, 2007 (AR 357) through July 8, 2010 (AR 242-357) while

28  Dr. Mandell while affiliated with the Jewish Family Service Agency.  Shapiro also treated with

Dr. Mandell when he was affiliated with the Growthspring Counseling & Wellness Group between December 7, 2010 (AR 422), and November 14, 2011.  AR 409-422.  Dr. Mandell's mental residual functional capacity questionnaire was filled out November 15, 2011, the day after Shapiro's last visit.  The progress notes for this visit indicate that Shapiro had been decompensating since his last visit, was experiencing debilitating anxiety on a daily basis, and that he was isolated and depressed.  Shapiro also reported current suicidal thoughts although no intent to act.  The progress note for this visit indicates Dr. Mandell diagnosed Plaintiff with major depressive disorder, recurrent, without psychotic features, and generalized anxiety order.  Shapiro's cognitive functioning was preoccupied, his affect blunted, his mood depressed and anxious, and his functional status impaired, although he was interactive on an interpersonal basis.  AR 409.  The treatment plan progress notes for this visit reflect that he had regressed all four treatment plan objectives.

The ALJ also gave little weight to Dr. Jenuan who treated Shapiro from December 27, 2010, to the date he filled out the mental residual functional capacity questionnaire on November 14, 2011.  AR 400 – 404.  There are no progress notes or other medical records of Dr. Jenuan in the Administrative Record.  However, the mental residual functional capacity questionnaire that Dr. Jenuan filled out indicates that he diagnosed Shapiro with major depressive disorder with recurrent severe panic disorder.  The handwriting on the form is difficult to read.  However, in the treatment and response portion of the questionnaire, Dr. Jenuan indicated that Shapiro needed intensive therapy, but he was unable to afford it.  Clinical findings included severe anxiety (illegible) inability to focus.

The prognosis was reported as retractory depression.  Dr. Jenuan filled out the mental abilities and aptitudes needed to do unskilled work portion of the form.  He opined that Shapiro was unable to meet competitive standards for remembering work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism

from supervisors, get along with co-workers or peers without unduly distracting them, or exhibiting behavioral extremes, deal with normal work stress, and be aware of normal hazards and take appropriate precautions.

He checked the box that Shapiro had no useful ability to function: to maintain attention for two-hour segments; maintain regular attendance and be punctual within customary usually strict tolerances; work in coordination with or in proximity to others without being unduly distracted; complete normal workday and workweek without interruptions from the psychologically-based symptoms; and respond appropriately to changes in routine work setting. Dr. Jenuan opined that Shapiro's mental abilities and aptitudes needed to do semi-skilled and skilled work made him unable to meet competitive standards of setting realistic goals or making plans independently of others. He also opined that Shapiro had no useful ability to understand or remember detailed instructions, carry out detailed instructions, or deal with stress of semi-skilled and skilled work. He checked the box that Shapiro was unable to meet competitive standards to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in an unfamiliar place, and use public transportation. Dr. Jenuan filled out the form indicating that the earliest date that the described limitations applied was December 20, 2010. AR 404.

Here, the ALJ found Dr. Mandell's opinion was inconsistent with the overall record which showed Plaintiff received routine, conservative care; Plaintiff was non-compliant with his treatment; Plaintiff continued smoking; and he did not have suicidal or homicidal ideation. Even assuming the ALJ properly determined Dr. Mandell's opinion was not entitled to controlling weight, the ALJ erred in failing to consider the factors set forth at 20 C.F.R. § 404.1527 in assigning weight to Dr. Mandell's opinion. The ALJ failed to consider the factors listed in 20 C.F.R. § 404.1527(c). The length of the treating relationship, the frequency of examination, the nature and extent of Dr. Mandell's relationship with Shapiro, and the fact that Dr. Mandell was offering an opinion in his area of specialty all weigh in favor of affording more than minimal weight to Dr. Mandell's opinions. *See* 20 C.F.R. § 404.1527(d)(2)(i)-(ii); *Orn,* 495 F.3d at 633. When Dr. Mandell completed the RFC Questionnaire on November 15, 2011, he

had been Shapiro's psychologist for several years and had seen Shapiro on a weekly basis for most of that time. *See generally* AR 356-57 (progress note dated November 27, 2007, which appears to be Shapiro's earliest appointment with Dr. Mandell in record); AR 242-43 (progress note dated July 1, 2010); AR 423-427 (mental RFC questionnaire dated November 15, 2011). He also failed to consider these factors in assessing the weight to be afforded Dr. Jenuan's opinions. The ALJ's failure to weigh any factors from 20 C.F.R. 404.1527(c) was contrary to law. *See Orn,* 495 F.3d at 632.

In addition, the ALJ did not set forth "specific and legitimate reasons" supported by substantial evidence in the record to reject the opinions of Drs. Mandel and Jenuan.[4] *See Ghanim,* 763 F.3d at 1161 (citing *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir.2008), and *Holohan,* 246 F.3d at 1202–03).

The ALJ assigned only a little weight to Dr. Mandell's opinion, finding it was "not consistent with the overall record that shows the claimant's treatment was limited to routine conservative prescription medication and treatment, he was noted as not complying with treatment, because he admitted he continued to smoke despite having COPD, and he was documented as denying any suicidal or homicidal ideation." AR 35. The court finds these are not "specific and legitimate" reasons supported by substantial evidence in the record. The Ninth Circuit has held than an ALJ states "specific and legitimate reasons" by setting out a "detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Orn,* 495 F.3d at 632 (9th Cir.2007). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctor['s], are correct." *Id.* An ALJ errs where he rejects or assigns little weight to a medical opinion "while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that

---

[4] Dr. Mandell's opinion was contradicted by both Dr. Pastora Roldan, Ph.D., a reviewing state agency psychologist; and Dr. Stephen Goldstein, Ed.D., a consultative psychological examiner who both opined that Plaintiff had minimal, if any, psychiatric limitations. AR 362-69, 376-88. The ALJ gave both Dr. Roldan's and Dr. Goldstein's opinions little weight because they did not fully consider Plaintiff's limiting symptoms, and the ALJ found Plaintiff's mental restriction limited him to only occasional interaction with the public and coworkers. AR 36.

1    fails to offer a substantive basis for his conclusion.  *Garrison v. Colvin,* 759 F.3d 995, 1013 (9th
2    Cir. 2014).

3           Here, the decision does not contain a "detailed and thorough summary of the facts and
4    conflicting clinical evidence" with the ALJ's interpretation of it.  *Orn,* 495 F.3d at 632.  Rather,
5    the ALJ found, in conclusory fashion, that Plaintiff's mental restrictions are more limiting than
6    Drs. Roldan or Goldstein opine, less limiting than Drs. Jenuan and Mandell opine, and result in a
7    limitation that Plaintiff only occasionally interact with the public and coworkers.

8           The reasons the ALJ provided for rejecting the treating physicians' opinions are not
9    specific and legitimate.  First, the ALJ concluded that Plaintiff received routine, conservative
10   care for his mental health issues. However, nothing in the record suggests additional treatment
11   modalities were available or recommended.  Second, Plaintiff's failure to stop smoking has no
12   bearing on Dr. Mandell's opinions concerning Plaintiff's psychiatric limitations.  The ALJ
13   ignored most of Dr. Mandell's treatment notes, did not examine their internal consistency, never
14   explicitly compared them, and did not explicitly state how the treatment notes were inconsistent
15   with the opinions of any other of the treating, consulting or examining physicians providing
16   opinions in this case.  The ALJ's finding that the Plaintiff denied homicidal or suicidal ideation
17   is supported by the record as a whole.   As the Commissioner concedes, a number of the
18   treatment records indicate Plaintiff had thoughts of dying or suicide.  However, the vast majority,
19   if not all, of the treatment notes, indicate that Plaintiff verbalized that he had no intention to
20   commit suicide, was ethically opposed to it, and would never do it because of the effect on his
21   son.  That Plaintiff was not suicidal is not dispositive of whether he suffers from severe
22   psychiatric problems that impair, limit or render him incapable performing substantial gainful
23   activity.

24          **B.      The ALJ's Assessment of Shapiro's Credibility.**

25          In determining whether a claimant's symptom testimony is credible, an ALJ must engage
26   in a two-step analysis.  *See Garrison,* 759 F. 3d 995, 1014 (9th Cir. 2014).  First, the ALJ must
27   determine whether the claimant has presented objective medical evidence of an underlying
28   impairment which could reasonably be expected to produce the alleged symptoms.  *Id.* (citing

*Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citation omitted).   If the ALJ determines the claimant has satisfied this burden, and there is no evidence of malingering in the record, an ALJ must articulate clear and convincing reasons to reject a claimant's pain and limitation testimony that rest on discrepancies between activities and assertions of pain.   *See id.* (citing *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir. 1996)).

   In evaluating Plaintiff's subjective complaints, an ALJ must consider the testimony in light of the record as a whole.   *See Reddick v. Chater,* 157 F.3d 715, 720 (9th Cir. 1998).   In addition, the ALJ must identify the testimony he finds is not credible and explain the evidence that undermines the testimony.   *See Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001).

   Here, the ALJ based his adverse credibility findings on three grounds.   First, the ALJ discounted Plaintiff's symptom testimony because of his "inability to continue regular counseling demonstrates a possible unwillingness to do what is necessary to improve his condition." AR 34.   He also found that his inability to continue regular counseling "may also be an indication that his symptoms were not as severe as he purported."   The opinion does not state whether the finding of Plaintiff's inability is based on financial or psychological reasons.   The Ninth Circuit has held that "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding unless one of a "number of good reasons for not doing so" applies.   *See Bunnell,* 947 F.2d at 346.   Dr. Mandell's treatment notes indicate Plaintiff could not afford to continue his weekly therapy sessions. AR 410.   The ALJ's decision acknowledges Plaintiff stopped seeing his psychologist because he could not afford it.   *See* AR 34 (finding there was "no evidence that Plaintiff sought low cost or no cost medical care as necessary").   The Ninth Circuit has criticized the use of lack of treatment to reject mental health complaints, both because mental illness is under-reported and because it questionable to chastise a person with a mental impairment for exercising poor judgment related to his or her treatment. *See Regennitter v. Comm'r of Soc. Sec. Adm.,* 166 F.3d 1294, 1299-1300 (9th Cir. 1999) (internal citation omitted).

   Additionally, although disability benefits "may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds," when free or no-cost medical

21

services are available to an indigent claimant, the claimant's poverty is not a valid reason to fail to seek treatment. *Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir.1995); SSR 96-7p (referring to availability of free or low-cost services as a relevant consideration to credibility determination). Here, the record shows that Dr. Mandell suggested to Shapiro that low-cost or no-cost services may be available to him. The ALJ found there was no evidence to suggest Plaintiff had attempted to take advantage of these services. However, there is also no indication in the record that there were any low-cost or no-cost service actually available. Dr. Mandell's November 14, 2011, treatment note indicates that the Southern Nevada Adult Mental Health Services would not accept Plaintiff. *See* AR 410. Under these circumstances, the record does not support the ALJ's finding that Plaintiff was not credible because he failed to seek available low-cost or no-cost services.

The ALJ also discounted Plaintiff's credibility on the grounds that he had only received routine, conservative care. The record reflects that Plaintiff received psychotherapy, cognitive behavioral therapy, and prescription medication to manage his mental health impairments. Generally, evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of a physical impairment. *See Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008) (internal citation omitted). The ALJ did not explain why he concluded this was conservative care and what more aggressive treatment could have been provided. No explanation is provided about available alternative treatment modalities.

The ALJ's credibility determination was also based on the ALJ determination that Plaintiff engaged in a "somewhat normal level of daily activity and interaction," and some of the physical, mental, and social abilities required to perform these tasks were the same as those necessary for obtaining and maintaining employment. AR 33, 34 (acknowledging failure to seek treatment not the primary basis for the ALJ's decision). In determining a claimant's credibility, an ALJ may consider whether the claimant engages in daily activities that are inconsistent with his alleged symptoms. *See Molina,* 674 F.3d at 1112 (citation omitted); *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005).

/ / /

The ALJ made specific findings about which of Plaintiff's daily activities undermined Plaintiff's allegations of disability.  For example, the ALJ found Shapiro took care of a fish and cat, had no physical problems with personal care, prepared simple meals, did a couple of loads of laundry and dishes per week, could go out alone, drive a car, shop in a store and online, watched television, surfed the internet and occasionally talked on the phone.  *Id.*  In addition, the ALJ correctly found Shapiro stated he could finish something if he started it, could pay attention for a long time if he were interested, could follow written instructions, and could get along with authority figures.  *Id.*  Shapiro's Adult Function Report, dated August 2, 2010, a little more than a month after his alleged date of onset, supports these findings.  AR 180-187.  *See,* also (Shapiro's testimony at administrative hearing).  AR 65.  The ALJ concluded that Shapiro's "ability to participate in such daily activities undermined the credibility of the claimant's allegations of disabling functional limitations."  *Id.*  The ALJ was permitted to make an adverse credibility finding based on Plaintiff's daily activities as one of several factors considered.  *See, e.g., Bray,* 554 F.3d at 1227 (activities supported adverse credibility finding where claimant was a caregiver, cooked, walked, cleaned, and drove).

**VI.   Conclusion.**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a while.  If the record will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's.  *See Flaten,* 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and differences of opinion.

Having reviewed the record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds the ALJ erred in failing to set forth specific, legitimate reasons for rejecting the opinion testimony of Plaintiff's treating psychiatrist, Dr. Jenuan and his treating psychologist, Dr. Mandell.  Even if the opinions were not entitled to

controlling weight, the ALJ erred in failing to consider the factors required by 20 C.F.R. § 404.1527 in assigning the weight to which these opinions were entitled. The ALJ also erred in finding Shapiro was not credible because he had only received conservative care for his mental health problems and had not taken advantage of available no low-cost or no-cost services.

Shapiro urges the court to credit Dr. Mandell's testimony as true and remand for an award of benefits. The Commissioner relies on the Ninth Circuit's opinion in *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), asserting there is an intra-circuit split as to whether the credit as true doctrine is mandatory, and the court should not credit Dr. Mandell's opinion as true and should remand for further proceedings.

Generally, if additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded. *See Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (citing *Lewin v. Schweiker,* 654 F.2d 631, 635 (9th Cir. 1981)). However, 42 U.S.C. § 405(g) vests the district courts with authority to remand with or without a hearing, and every circuit has recognized that in certain circumstances, courts may remand for an award of benefits. *Id.* (collecting cases).

The Ninth Circuit developed the following "workable and stable framework for applying the credit-as-true rule." *Garrison,* 759 F.3d at 1020. Courts should credit lay or medical opinion testimony as true on remand when (1) the record has been fully developed, and further administrative proceedings would serve "no useful purpose;" (2) the ALJ failed to provide legally-sufficient reasons for rejecting either claimant testimony or medical evidence; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Id.*

*Garrison* also clarified that if the court determines a claimant is otherwise entitled to an immediate award of damages under the credit-as-true analysis, the court still has discretion to apply the credit-as-true doctrine flexibly. *Id.* (citing *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003). Because the analysis in a Social Security case centers on whether the evidence establishes the existence of a disability, where the record as a whole "creates serious doubt" the claimant is disabled, the court has the discretion to remand for further proceedings even if the

24

1  claimant would otherwise be entitled to an immediate award of benefits under the credit-as-true

2  rule. *Id.*

3          In this case, the court finds that the record as a whole creates serious doubts as to whether

4  Shapiro is, in fact, disabled within the meaning of the Social Security Act.   The ALJ did not

5  provide a meaningful analysis of Plaintiff's mental RFC.   However, he properly found Plaintiff's

6  self-reported daily activities suggest his functional limitations are not as severe as alleged.   In

7  addition, one consultative examiner and one reviewing physician opined Plaintiff had minimal

8  psychiatric limitations.   By contrast, both Dr. Mandell and Dr. Jenuan opined that Plaintiff's

9  mental limitations precluded him from employment.   The ALJ did not discuss Dr. Mandell's

10 extensive progress notes in his decision. There are no progress notes or other treatment records

11 for Dr. Jenuan in the record, and Dr. Jenuan's opinions are contained in a check-the-box form

12 without any narrative or explanation for his opinions. These inconsistencies create serious doubt

13 as to whether Plaintiff is disabled by his mental functional limitations.   The court will therefore

14 recommend remanding this matter for further proceedings consistent with this opinion.

15          For all of the foregoing reasons,

16          **IT IS RECOMMENDED:**

17          1.  Plaintiff's Motion to Reverse (Dkt. #25) be GRANTED and this case be remanded for

18              further proceedings consistent with this opinion.

19          2.  The Commissioner's Cross-Motion to Affirm (Dkt. #28) be DENIED.

20          3.  The Clerk of Court be instructed to enter judgment accordingly and close this case.

21          Dated this 22nd day of June 2015.

22

23                                                    _____

24                                                    PEGGY A. LEEN
                                                      UNITED STATES MAGISTRATE JUDGE

25

26

27

28

25